UNITED STATED DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| ESTATE OF JODY PIDGEON,<br>Jennifer Pidgeon, Administrator, and<br>JENNIFER PIDGEON, Individually,<br>Plaintiffs, | ) | |
| v. | ) | Civil Action No.26-7 |
| THE RUTLAND HOSPITAL, INC. d/b/a/<br>RUTLAND REGIONAL MEDICAL CENTER,<br>Defendant. | ) | |

# COMPLAINT

## THE PARTIES

1. Jennifer Pidgeon is the widow of Jody Pidgeon.

2. Jennifer Pidgeon is a resident of the City of Rutland.

3. Jody Pidgeon died on February 10, 2025.

4. The Vermont Superior Court, Probate Division, Rutland Unit issued Letters Testamentary to Jennifer Pidgeon and appointed her the administrator of the Estate of Jody Pidgeon.

5. The Rutland Hospital, Inc. is organized and exists under the laws of Vermont, has its principal place of business in Rutland and does business as Rutland Regional Medical Center ("RRMC" or "the hospital").

## SUBJECT MATTER JURISDICTION
## 28 U.S.C. § 1331
## 28 U.S.C. § 1367

6. 28 U.S.C. § 1331 gives this court federal question jurisdiction over the claims brought by the plaintiffs under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.

7. 28 U.S.C. § 1367 gives this court supplemental jurisdiction over the claims brought by the plaintiffs under Vermont law related to federal question claims because they are part of the same case or controversy.

**PERSONAL JURISDICTION**

8. This court has personal jurisdiction over RRMC because the hospital is organized and exists under Vermont law, has its principal place of operation in Vermont and knowingly and purposely does business in Vermont.

**THE FACTS**

9. RRMC is a "participating hospital" that accepts payments from Medicare or the Centers for Medicare & Medicaid Services.

10. RRMC has an Emergency Department.

11. In February 2025, Jody Pidgeon was suffering a variety of significant medical conditions including, but not limited to, a perforated bowel, chronic myelomonocytic leukemia, atherosclerotic and hypertensive cardiovascular disease, diabetes mellitus and a respiratory syncytial virus infection.

12. Mr. Pidgeon regularly received treatment at RRMC.

13. Mr. Pidgeon had medical insurance provided by Medicare.

14. On February 8, 2025, Mr. Pidgeon went to RRMC Emergency Department.

15. Mr. Pidgeon was admitted to RRMC.

16. Mr. Pidgeon received treatment at RRMC.

17. During the course of his hospitalization, RRMC employees urged Mr. Pidgeon to enter hospice care and urged him to agree to a "do not resuscitate" order (DNR).

18. Mr. Pidgeon agreed to a DNR, but then revoked the DNR.

19. Between February 8, 2025 and February 10, 2025, while an inpatient at RRMC, Mr. Pidgeon was suffering from infections.

20. Between February 8, 2025 and February 10, 2025, while an inpatient at RRMC, Mr. Pidgeon had episodes of delirium.

21. On the morning of February 10, 2025, a RRMC doctor told Mr. Pidgeon he was going to be discharged.

22. A number of hours later, RRMC employees told Mr. Pidgeon that he had to leave the hospital.

23. Mr. Pidgeon, who was having difficulty speaking, made clear to the hospital employees that he wished to remain in the hospital.

24. Employees of the hospital told Mr. Pidgeon he had to leave the hospital.

25. A RRMC employee put Mr. Pidgeon in a wheelchair and pushed him to the exit/entrance to the RRMC Emergency Department.

26. A RRMC employee threw Mr. Pidgeon's hat out of the door.

27. A RRMC employee pushed Mr. Pidgeon out of the door.

28. The RRMC employee left Mr. Pidgeon sitting in a wheelchair at the entrance to the Emergency Department.

29. Mr. Pidgeon stood and tried to reenter the hospital.

30. RRMC employees prevented Mr. Pidgeon from reentering the hospital.

31. At approximately 2:38 p.m. on February 10, 2025, an employee of the hospital called the Rutland City Police Department ("RCPD") and asserted that Mr. Pidgeon had been

discharged and was “trespassing” by failing to leave the hospital grounds.

32. RCPD officers went to the hospital.

33. At the time of the arrival of the officers, Mr. Pidgeon was sitting in a wheelchair at the entrance to RRMC Emergency Department opposite members of the hospital’s security team.

34. Almost the only thing Mr. Pidgeon could say in response to questions from members of the hospital security team and the RCPD officers was “help me.”

35. RRMC employees told RCPD officers that Mr. Pidgeon was “faking it” and “pretending to not talk because he did not want to leave.”

36. A RRMC employee prepared and signed a pre-printed “no trespass order” and served it upon Mr. Pidgeon.

37. Not long before the service of the “no trespass order,” a RRMC employee had given Mr. Pidgeon written “discharge instructions” telling him to return to the hospital the next day, February 11, 2025 for treatment.

38. Multiple RRMC employees and RCPD officers insisted that Mr. Pidgeon get out of his wheelchair.

39. RCPD officers lifted Mr. Pidgeon from the wheelchair.

40. RCPD officers held Mr. Pidgeon’s arms and walked him to his automobile in the RRMC Emergency Department parking lot.

41. A RCPD officer told Mr. Pidgeon he would be arrested if he returned to the hospital.

42. Mr. Pidgeon got into his automobile.

43. The RCPD officers left RRMC.

44. Mr. Pidgeon remained in his automobile in the RRMC Emergency Department parking lot.

45. The windshield of Mr. Pidgeon's automobile was covered in snow.

46. A hospital employee went to Mr. Pidgeon's automobile, removed snow from the windshield and told Mr. Pidgeon he had to leave.

47. Another RRMC employee has said that Mr. Pidgeon's condition was such that he should not have been made to operate a motor vehicle.

48. Mr. Pidgeon drove away, but his car hit at least two other cars while leaving the RRMC Emergency Department parking lot.

49. An employee of the hospital telephoned the Police Department again.

50. RCPD found Mr. Pidgeon's car in a parking lot on Wilcox Avenue in Rutland, a very short distance from the hospital.

51. The front of Mr. Pidgeon's car was in a snow bank.

52. Mr. Pidgeon's automobile did not have significant damage.

53. Mr. Pidgeon was not responsive.

54. Police Department officers broke a window in Mr. Pidgeon's automobile and removed him from the vehicle.

55. At this time, RCPD officers said that Mr. Pidgeon had an altered mental status

56. At about 3:19 p.m., the police officers summoned the Rutland Regional Ambulance Service (Ambulance Service).

57. At about 3:21 p.m., Emergency Medical Technicians (EMTs) employed by the Ambulance Service arrived at the scene.

58. At least one EMT found Mr. Pidgeon "hot to touch," and said he showed "signs of profound shock."

59. The EMT concluded that Mr. Pidgeon was septic, a life-threatening condition that occurs when the body's immune system reacts to infection.

60. The EMTs put Mr. Pidgeon in an ambulance and, in a transport that lasted about one minute, returned him to RRMC.

61. The EMTs returned Mr. Pidgeon to the hospital at approximately 3:28 p.m., about one hour from when the hospital had issued a no trespass order and made Mr. Pidgeon leave.

62. The EMTs pushed Mr. Pidgeon, who was lying on a gurney, into the hospital.

63. Mr. Pidgeon was gray, his lips were dried and cracked, his stomach was distended, his body covered with dark purple sores, dark thick blood was coming from his nose, his legs from his knees down were two to three times their normal size, and there were open wounds on his shins and feet.

64. RRMC employees told the EMTs that they could not bring Mr. Pidgeon into the Emergency Department.

65. According to at least one witness, while lying on the gurney in the hallway outside the Emergency Department, Mr. Pidgeon was "writhing in pain" and able say little more than "help."

66. At least one RRMC employee asserted that Mr. Pidgeon was "faking it."

67. An EMT employed by the Ambulance Service said, "I guarantee you he's not f...ing faking it. He's hot to the touch and he's septic."

68. RRMC health care providers refused or failed to provide medical care to Mr. Pidgeon.

69. Dr. Daniel Burton, a RRMC saw Mr. Pidgeon in the hallway outside the Emergency Department, but failed to do a proper assessment of Mr. Pidgeon and failed provide any care to Mr. Pidgeon.

70. Because of the failure of RRMC healthcare providers to care for Mr. Pidgeon, at least one Ambulance Service EMT and at least one RRMC security guard tried to provide care to Mr. Pidgeon while he was lying on a gurney at the entrance to the Emergency Department.

71. Eventually, the EMTs and the security guard took Mr. Pidgeon in the Emergency Department.

72. An Ambulance Service EMT attempted to give Mr. Pidgeon oxygen.

73. An Ambulance Service EMT placed heart-monitor leads on Mr. Pidgeon's body.

74. An Ambulance Service EMT said: "After hooking up the heart monitors, the machine was turned on and immediately began alerting with audible alarms."

75. The Ambulance Service EMT let the alarm continue to sound so as to draw attention from RRMC healthcare providers.

76. The Ambulance Service EMT said: "No nurses came but Dr. [Daniel] Burton [an employee of RRMC] did stand outside of the room without providing physical assistance."

77. An RRMC ED technician came in and assisted the Ambulance Service EMT.

78. An Ambulance Service EMT noticed Mr. Pidgeon's condition continuing to rapidly deteriorate and informed Dr. Burton.

79. Dr. Burton entered Mr. Pidgeon's room.

80. Mr. Pidgeon, who was struggling to speak, began looking around the room.

81. Mr. Pidgeon made eye contact with the Ambulance Service EMT, two RRMC security officers and Dr. Burton.

82. Mr. Pidgeon struggled to talk.

83. Dr. Burton asked Mr. Pidgeon if he wanted to be intubated.

84. Mr. Pidgeon was "able to give an audible 'yes.'"

85. Dr. Burton left the room without intubating Mr. Pidgeon.

86. After several minutes, a physician other than Dr. Burton walked to the doorway of the room. She looked at Mr. Pidgeon and was visibly shocked.

87. This physician walked away, but came back not long thereafter and ordered RRMC employees to take Mr. Pidgeon to a resuscitation room and to treat him.

88. An employee of RRMC called Mr. Pidgeon's wife and told her that Mr. Pidgeon had driven his automobile over an embankment and would not survive injuries sustained in the automobile accident.

89. The statements that Mr. Pidgeon had driven his automobile over an embankment and had sustained fatal injuries by driving his automobile over an embankment were false.

90. While RRMC Emergency Department personnel, including Dr. Burton, were attempting to intubate Mr. Pidgeon, a RRMC employee told them not to intubate Mr. Pidgeon .

91. While RRMC employees were attempting to intubate Mr. Pidgeon, he died.

92. Mr. Pidgeon died no later than 4:48 p.m., about one hour and twenty minutes after his return to the hospital.

93. At 5:08 p.m., the Rutland City Police Department received a telephone call from a person

at the hospital.

94. The witness, who asked to remain anonymous, described the events described in this Complaint.

95. The Police Department started an investigation.

96. The person responsible for the Police Department's investigation, a detective, arrived at the hospital at about 5:34 p.m.

97. The detective reported that "there were no visual signs of trauma due to the motor vehicle accident."

98. An employee or agent of the Office of the Chief Medical Examiner requested an autopsy.

99. On February 11, 2025, a doctor employed by the Office of the Chief Medical Examiner conducted an autopsy.

100. On February 11, 2025, the Office of the Chief Medical Examiner issued a report stating that the "cause of death" was "chronic myelomonocytic leukemia" and "other significant conditions" included atherosclerotic and hypertensive cardiovascular disease, bowel perforation by an ingested toothpick, infection with respiratory syncytial virus infection and diabetes mellitus.

101. On February 11, 2025 the Office of the Chief Medical Examiner ruled that the "manner of death" was "accident (an ingested toothpick)."

102. The Report of the Office of Chief Medical Examiner contained a "comment" that said: "The manner of death is certified as accident due to contributing/significant condition of bowel perforation by ingested toothpick (a non-natural process). While the date of this injury is uncertain, the gross and histopathologic appearance of this bowel perforation

suggest a more remote injury/perforation."

103. The bowel perforation is a probable cause of one of the infections Mr. Pidgeon had while an inpatient at RRMC between February 8, 2025 and February 10, 2025.

104. The acts and omissions of employees of RRMC on February 10, 2025 were criminal in that, at a minimum, the omissions constituted the neglect of a vulnerable adult in violation of 13 V.S.A. §1378.

**COUNT I**
**The Emergency Medical Treatment and Active Labor Act (EMTALA)**
**42 U.S.C. § 1395dd**
**Failure to Stabilize Before Discharge**

105. At the time of his discharge from RRMC on February 10, 2025, Mr. Pidgeon suffered from medical conditions manifesting themselves by acute symptoms such that these conditions could reasonably be expected to place Mr. Pidgeon's health in serious jeopardy, or result in serious impairment to his bodily functions, or result in serious dysfunction of at least one of his bodily organs if Mr. Pidgeon were discharged from RRMC.

106. RRMC was aware of some of Mr. Pidgeon's medical conditions, including, but not limited to leukemia, and should have been aware of all of his medical conditions.

107. RRMC discharged Mr. Pidgeon.

108. RRMC failed to stabilize Mr. Pidgeon's conditions before discharging him from the hospital.

**COUNT II**
**The Emergency Medical Treatment and Active Labor Act (EMTALA)**
**42 U.S.C. § 1395dd**
**Failure to Provide Appropriate Screening**

109. The plaintiffs restate paragraphs 1 through 104.

110. On his return to RRMC's Emergency Department on February 10, 2025, Mr. Pidgeon was suffering from an emergency medical condition manifesting itself by acute symptoms, including severe pain, such that the absence of immediate medical attention could reasonably be expected to place Mr. Pidgeon's health in serious jeopardy or result in serious impairment of his bodily functions or serious dysfunction of at least one of his bodily organs.

111. Employees of RRMC failed to adequately assess Mr. Pidgeon to determine whether he had an emergency medical condition.

112. Employees of RRMC refused or failed to provide treatment necessary to stabilize Mr. Pidgeon's emergency medical condition upon his return to RRMC.

**Count III**
**Intentional and/or Reckless Infliction of Emotional Distress**
**Jody Pidgeon**
**Restatement of Torts (Second) § 46**

113. The plaintiffs restate paragraphs 1 through 104.

114. On February 10, 2025, the employees of RRMC acted intentionally or recklessly.

115. The conduct of RRMC's employees was extreme and outrageous.

116. The conduct of RRMC employees would cause a reasonable person extreme emotional distress.

117. The conduct of RRMC employees caused Mr. Pidgeon severe emotional distress.

**COUNT IV**
**Medical Malpractice**
**Wrongful Injury to Jody Pidgeon Before His Death**
**12 V.S.A. § 1908**
**14 V.S.A. § 1452**

118. The plaintiffs restate paragraphs 1 through 104.

119. RRMC employees, while acting within the scope of their employment, deviated from the standard of care during their treatment of Mr. Pidgeon by failing to exercise the degree of knowledge or skill possessed by, or the degree of care ordinarily exercised by, reasonably skillful, careful and prudent health care professionals engaged in similar practices under the same or similar circumstances whether or not within the State of Vermont, or by lacking this degree of knowledge or skill, or by failing to exercise this degree of care.

120. But for these deviations from the standard of care, Mr. Pidgeon would not have died when he died and would not have suffered before his death.

121. The deviations from the standard of care by the defendant's employees were a substantial factor in Mr. Pidgeon's pain and suffering prior to his death.

**COUNT V**
**Medical Malpractice**
**Wrongful Death**
**12 V.S.A. § 1908**
**14 V.S.A. § 1492**

122. The plaintiffs restate paragraphs 1 through 104.

123. RRMC employees, while acting within the scope of their employment, deviated from the standard of care during their treatment of Mr. Pidgeon by failing to exercise the degree of knowledge or skill possessed by, or the degree of care ordinarily exercised by, reasonably

skillful, careful and prudent health care professionals engaged in similar practices under the same or similar circumstances whether or not within the State of Vermont, or by lacking this degree of knowledge or skill, or by failing to exercise this degree of care.

124. But for these deviations from the standard of care, Mr. Pidgeon would not have died when he died.

125. The deviations from the standard of care by the defendant's employees were a substantial factor in Mr. Pidgeon's death.

126. As a direct and proximate result of the deviations from the standard of care by the defendant's employees, Mr. Pidgeon's next of kin, Jennifer Pidgeon, suffered pecuniary and other losses and experienced great emotional distress.

**Count VI**
**Intentional and/or Reckless Infliction of Emotional Distress**
**Jennifer Pidgeon**
**Restatement of Torts (Second) § 46**

127. The plaintiffs restate paragraphs 1 through 104.

128. On February 10, 2025, the employees of RRMC acted intentionally or recklessly.

129. The conduct of RRMC's employees was extreme and outrageous.

130. The conduct of RRMC employees would cause a reasonable person extreme emotional distress

131. The conduct of RRMC employees caused Ms. Pidgeon severe emotional distress.

**COUNT VII**
**Loss of Consortium**
**Jennifer Pidgeon**

132. The plaintiffs restate paragraphs 1 through 104.

133. As a direct and proximate result of the negligent acts and omissions of the defendant's employees, Ms. Pidgeon has been, and will be, deprived of the love, care, comfort, society and consortium of Mr. Pidgeon.

**PLAINTIFFS DEMAND TRIAL BY JURY.**

**PLAINTIFFS SEEK REASONABLE ATTORNEYS' FEES AND COSTS.**

**PLAINTIFFS SEEK THE IMPOSITION OF PUNITIVE DAMAGES.**

A Certificate of Merit pursuant to 12 V.S.A. § 1042 is attached.

WHEREFORE, the Estate of Jody Pidgeon and Jennifer Pidgeon request judgment against The Rutland Hospital, Inc. d/b/a/ Rutland Regional Medical Center, full, fair and just compensation, reasonable attorneys' fees and costs, punitive damages and such other relief as is appropriate, just and proper.

Dated: January 15, 2026

ESTATE OF JODY PIDGEON,
Jennifer Pidgeon, Administrator and
JENNIFER PIDGEON, Individually

By: /s/Michael F. Hanley

Michael F. Hanley
Plante & Hanley, P.C.
Post Office Box 708
White River Junction, VT 05001
802-295-3151, Ext. 102
mfhanley@plantehanley.com