UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ESTATE OF JODY PIDGEON,        )
JENNIFER PIDGEON,              )
ADMINISTRATOR,                 )
                               )
        Plaintiff,             )
                               )
            v.                 )        Case No. 2:26-cv-7
                               )
THE RUTLAND HOSPITAL, INC.,    )
D/B/A RUTLAND REGIONAL         )
MEDICAL CENTER,                )
                               )
        Defendant.             )

**OPINION AND ORDER**

The Estate of Jody Pidgeon, through Administrator Jennifer Pidgeon, brings this action alleging, among other things, medical malpractice resulting in Jody Pidgeon's death at Rutland Regional Medical Center ("RRMC"). The Complaint asserts five state law causes of action and two claims (Counts I and II) under the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). Pending before the Court is RRMC's motion to dismiss Counts I and II for failure to state a claim, and the remaining causes of action for lack of subject matter jurisdiction. For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

**Background**

For purposes of the pending motion to dismiss, the facts in the Complaint are accepted as true. The Complaint alleges that

in February 2025, Jody Pidgeon suffered from several medical conditions, including perforated bowel; chronic myelomonocytic leukemia; atherosclerotic and hypertensive cardiovascular disease; diabetes mellitus; and a respiratory syncytial virus infection. He had been receiving treatment regularly at RRMC and was insured by Medicare. RRMC is a hospital that accepts payments from Medicare.

On February 8, 2025, Mr. Pidgeon went to the RRMC Emergency Department and was admitted to the hospital. During his hospitalization, RRMC employees urged him to enter hospice care and to agree to a "do not resuscitate" ("DNR") order. Mr. Pidgeon initially agreed to a DNR, but later revoked his consent.

While an inpatient at RRMC between February 8, 2025 and February 10, 2025, Mr. Pidgeon suffered from infections and episodes of delirium. On the morning of February 10, 2025, a doctor at the hospital informed Mr. Pidgeon that he was going to be discharged. Later that day, RRMC employees told Mr. Pidgeon that he had to leave the hospital. Although he was having trouble speaking, Mr. Pidgeon made clear that he wanted to stay. A hospital employee placed him in a wheelchair and pushed him to the exit of the RRMC Emergency Department. The Complaint alleges that an RRMC employee then pushed him out the door.

2

Mr. Pidgeon stood and tried to reenter the hospital, but RRMC employees prevented him from doing so. At approximately 2:38 p.m. on February 10, 2025, an employee of the hospital called the Rutland City Police Department ("RCPD") asserting that Mr. Pidgeon had been discharged and was "trespassing" by failing to leave hospital grounds. RCPD then arrived at the hospital and found Mr. Pidgeon sitting in a wheelchair in the entrance to the RRMC Emergency Department, opposite members of the hospital's security team. According to the Complaint, "[a]lmost the only thing Mr. Pidgeon could say in response to questions from members of the hospital security team and the RCPD officers was 'help me.'" ECF No. 1 at 4.

Hospital employees told the police that Mr. Pidgeon was faking, and was pretending to be unable to talk because he did not want to leave. One RRMC employee prepared and signed a pre-printed "no trespass" order and served it upon Mr. Pidgeon. The hospital also provided Mr. Pidgeon with discharge instructions, informing him that he should return the next day for treatment.

Hospital employees and police officers each told Mr. Pidgeon to get out of his wheelchair. RCPD officers then lifted him from the wheelchair, held his arms and walked him to his vehicle in the Emergency Department parking lot. One officer told Mr. Pidgeon he would be arrested if he returned to the hospital. The police then left RRMC.

Mr. Pidgeon remained in his vehicle, the windshield of which was covered in snow. A hospital employee went to the vehicle, removed the snow, and told Mr. Pidgeon he had to leave. According to the Complaint, a different hospital employee "has said that Mr. Pidgeon's condition was such that he should not have been made to operate a motor vehicle." *Id.* at 5. Mr. Pidgeon drove away, hitting at least two other cars while leaving the parking lot. A hospital employee called the police.

RCPD officers found Mr. Pidgeon's vehicle in a parking lot a short distance from the hospital. The front of the vehicle was in a snow bank. The vehicle did not have significant damage. Mr. Pidgeon was not responsive. RCPD officers broke a window in the vehicle and removed Mr. Pidgeon. The officers determined that he was in an altered mental state, and at 3:19 p.m. called the Rutland Regional Ambulance Service ("Ambulance Service"). EMTs employed by the Ambulance Service arrived at the scene at 3:21 p.m.

At least one EMT found Mr. Pidgeon "hot to touch," saying he showed "signs of profound shock." *Id.* at 6. The EMT concluded that Mr. Pidgeon was septic, which the Complaint alleges is "a life-threatening condition that occurs when the body's immune system reacts to infection." *Id.* EMTs put Mr. Pidgeon in an ambulance and transported him approximately one minute back to RRMC, arriving at the hospital at 3:28 p.m.

4

EMTs pushed Mr. Pidgeon, who was lying on a gurney, into the hospital. His complexion was gray, his lips were dried and cracked, and his stomach was distended. His body was covered with dark purple sores, and thick, dark blood was coming from his nose. His legs from the knees down were two to three times their normal size, and there were open wounds on his shins and feet.

RRMC employees told the EMTs they could not bring Mr. Pidgeon into the Emergency Department. According to at least one witness, Mr. Pidgeon was writhing in pain and unable to say much more than "help." At least one RRMC employee allegedly asserted that Mr. Pidgeon was "faking it." An EMT from the Ambulance Service reportedly responded: "I guarantee you he's not f-ing faking it. He's hot to the touch and he's septic." *Id.* The Complaint alleges that RRMC health care providers nonetheless refused or failed to provide Mr. Pidgeon with medical care. More specifically, the Complaint alleges that Dr. Daniel Burton saw Mr. Pidgeon in the hallway outside the Emergency Department but "failed to do a proper assessment of Mr. Pidgeon and failed [to] provide any care to Mr. Pidgeon." *Id.* at 7.

One Ambulance Service EMT and one RRMC security guard tried to provide Mr. Pidgeon with care while he was lying on the gurney at the entrance to the Emergency Department. They then took Mr. Pidgeon into the Emergency Department themselves, and

an EMT attempted to provide him with oxygen. The EMT also placed heart-monitor leads on Mr. Pidgeon's body. According to the EMT, the machine linked to the monitors immediately began alerting with audible alarms. The EMT allowed the alarms to continue in order to draw the attention of RRMC healthcare providers. According to the EMT, "[n]o nurses came but Dr. Burton did stand outside of the room without providing physical assistance." *Id.*

An Ambulance Service EMT informed Dr. Burton that Mr. Pidgeon's condition was rapidly deteriorating. Dr. Burton entered the room and asked Mr. Pidgeon if he wanted to be intubated. Mr. Pidgeon, who had been struggling to speak, gave an audible "yes." Dr. Burton then left the room. After several minutes, a different RRMC physician walked to the doorway, looked at Mr. Pidgeon and "was visibly shocked." *Id.* at 8. That physician subsequently ordered RRMC employees to take Mr. Pidgeon to a resuscitation room for treatment. While RRMC Emergency Department personnel, including Dr. Burton, were trying to intubate Mr. Pidgeon, another RRMC employee told them not to intubate. Mr. Pidgeon died during the intubation process, at approximately 4:48 p.m.

At 5:08 p.m., the RCPD received a call from someone at the hospital. A detective arrived at the hospital at approximately 5:34 p.m. to begin an investigation. The detective reported that "there were no visual signs of trauma due to the motor vehicle

accident." *Id.* at 9. On February 11, 2025, an autopsy report identified the cause of death as "chronic myelomonocytic leukemia" and "other significant condition" including bowel perforation cause by an ingested toothpick. *Id.* The Office of the Chief Medical Examiner ruled the manner of death was an accident, identifying the ingested toothpick as the cause. *Id.* The Chief Medical Examiner's report also concluded that "[w]hile the date of the injury is uncertain, the gross and histopathologic appearance of this bowel perforation suggest a more remote injury/perforation." *Id.* at 9-10. The Complaint alleges that the bowel perforation is a probable cause of one of the infections Mr. Pidgeon experienced while an inpatient at RRMC between February 8, 2025 and February 10, 2025.

The Complaint sets forth seven causes of action. Count I brings a claim under EMTALA, 42 U.S.C. § 1395dd, for failure to stabilize Mr. Pidgeon before his discharge from the hospital on February 10, 2025. Count II alleges a second EMTALA claim for failure to provide an appropriate screening when Mr. Pidgeon was returned to the hospital by ambulance. Counts III through VII allege state law claims: intentional and/or reckless infliction of emotional distress on Mr. Pidgeon (Count III); medical malpractice for wrongful injury to Mr. Pidgeon before his death (Count IV); medical malpractice for wrongful death (Count V); intentional and/or reckless infliction of emotional distress on

7

Mr. Pidgeon's wife, Jennifer Pidgeon (Count VI); and Jennifer Pidgeon's loss of consortium (Count VII).

Pending before the Court is RRMC's motion to dismiss Counts I and II for failure to state a claim, and to dismiss the remaining state law causes of action for lack of subject matter jurisdiction.

## **Discussion**

### I.   **Motion to Dismiss Standards**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all factual allegations and draws all reasonable inferences in favor of the non-moving party. *Romanova v. Amilus Inc*., 138 F.4th 104, 108 (2d Cir. 2025). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The Court's charge in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Jennings v. Hunt Companies, Inc*., 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004)).

8

Dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction is proper when "the district court lacks the statutory or constitutional power to adjudicate" the plaintiff's claim. *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (quotation marks omitted). When a court has original jurisdiction over a claim, as when a claim is brought pursuant to a federal statute, the court also has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c).

## II.   EMTALA

Enacted in 1986, EMTALA forbids "patient dumping, the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions are stabilized." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999). The statute requires that hospitals first provide an "appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a). If an individual is determined to have an emergency medical condition, the hospital must "stabilize" the condition before transferring the

9

patient "outside [the] hospital's facilities." *Id.* §§ 1395dd(b) and (c) (discussing stabilization and restrictions on transfer). As explained by the United States Court of Appeals for the Eleventh Circuit, the statute was intended to prevent

> the practice of some hospital emergency rooms turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment. In enacting EMTALA, Congress was concerned with widespread reports of emergency rooms "dumping" indigent patients from one hospital to the next without regard to the patients' medical conditions. Congress' solution was to guarantee patient entry into the medical system via mandatory appropriate medical screenings and stabilization prior to transfer.

*Harry v. Marchant*, 291 F.3d 767, 772–73 (11th Cir. 2002) (internal citations omitted). "Although Congress was concerned that the indigent and uninsured tended to be the primary victims of patient dumping, EMTALA is not limited to these individuals." *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 173 (3d Cir.), *amended*, 586 F.3d 1011 (3d Cir. 2009); *see also id.* ("any individual who suffers personal harm as a direct result of a hospital's violation of the statute may bring a private civil action for damages").

"The legislative history of EMTALA makes clear the statute was not intended to be a federal malpractice statute, but instead was meant to supplement state law solely with regard to the provision of limited medical services to patients in emergency situations." *Harry*, 291 F.3d at 773 (citations

omitted). The Second Circuit similarly concluded that "EMTALA is not a substitute for state law on medical malpractice [and is not] intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Hardy*, 164 F.3d at 792 (citations and internal quotation marks omitted).

### A.    Failure to Stabilize

Count I alleges a failure to stabilize as required by 42 U.S.C. § 1395dd(b)(1). Section 1395dd(b)(1) provides as follows:

> (b) Necessary stabilizing treatment for emergency medical conditions and labor
>
> (1) In general
>
> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either —
>
>> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>>
>> (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd.

RRMC offers several arguments for dismissal of Count I. The hospital first contends that the statute requires knowledge of an emergency medical condition, and that it had no knowledge of Mr. Pidgeon's bowel perforation. RRMC also argues that

11

Plaintiff's claim does not apply to the time between February 8 and February 10 when Mr. Pidgeon was an admitted patient. The Complaint states that the facts underlying Count I occurred prior to Mr. Pidgeon's discharge from the hospital on February 10, 2025. ECF No. 1 at 10.

At least one court in this Circuit has held that a "hospital's obligations under EMTALA end when the hospital admits a patient for inpatient care." *Neeseman v. Mt. Sinai West*, No. 17-CV-1766 (LGS), 2018 WL 626358, at *4 (S.D.N.Y. Jan. 30, 2018) (dismissing EMTALA claim against hospital defendants because the complaint did not allege that plaintiff was denied emergency care) (citing cases). *Neeseman* explained that "[a]lthough the Second Circuit has not addressed the issue, the Fourth and Ninth Circuits, as well as district courts throughout the country, have" applied that same holding. 2018 WL 626358, at *4 (citing *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1167 (9th Cir. 2002); *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996)). *Neeseman* also cited the relevant federal regulation, which states:

> (i) If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24(d)(2).

12

Count I applies to the time period during which Mr. Pidgeon was an admitted inpatient at RRMC. There is no allegation that his admission on February 8, 2025 was in bad faith. He spent two days in the hospital and was discharged. Plaintiff claims the hospital failed to stabilize his condition.

As the federal regulation makes clear, once Mr. Pidgeon was admitted after screening on February 8, the hospital had no further obligation under EMTALA. *See* 42 C.F.R. § 489.24(d)(2)(i); *see also Bryant*, 289 F.3d at 1168 ("We hold that EMTALA's stabilization requirement ends when an individual is admitted for inpatient care."). He was not being "dumped" to another hospital or refused care. To the extent his treatment during that two-day period gave rise to a claim of medical malpractice for failure to stabilize his condition, his remedies lie in state law, not federal law. *See Bryant*, 289 F.3d at 1169 ("After an individual is admitted for inpatient care, state tort law provides a remedy for negligent care. If EMTALA liability extended to inpatient care, EMTALA would be converted into a federal malpractice statute, something it was never intended to be.") (cleaned up)).

RRMC also moves to dismiss Count I because its staff had no knowledge of Mr. Pidgeon's emergency condition. There is no dispute that RRMC did not know about the toothpick that had perforated Mr. Pidgeon's bowel.

EMTALA's stabilization requirement is triggered when "the hospital determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1). Courts have interpreted this language as requiring "actual knowledge" of such a condition. *See, e.g., Torretti v. Main Line Hospitals, Inc.*, 580 F.3d 168, 178 (3d Cir. 2009) (holding that statute requires "the hospital actually knew of [plaintiff's emergency medical] condition"); *Battle v. Mem. Hosp. at Gulfport,* 228 F.3d 544, 558 (5th Cir. 2000) ("The duty to stabilize does not arise unless the hospital has actual knowledge that the patient has an unstabilized medical emergency."); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268-69 (6th Cir. 1990) (interpreting "the vague phrase 'emergency medical condition' to mean a condition within the actual knowledge of the doctors on duty"); *see also Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996) (concluding that hospitals are not held "accountable [under EMTALA] for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware"). The Second Circuit has not addressed this statutory provision.

In this case, RRMC staff believed that Mr. Pidgeon required non-emergency medical care, as his discharge papers required him to return the next day. With respect to any emergent medical needs, however, RRMC did not perceive any such needs. In fact,

14

at least one RRMC staff member accused Mr. Pidgeon of faking his condition.

Plaintiff argues that actual knowledge of the underlying condition is not required, and that the question is instead whether the hospital knew that Mr. Pidgeon's condition would materially deteriorate without treatment. Under the statute, however, the likelihood of "material deterioration" is a criterion for determining whether the patient has been adequately stabilized. 42 U.S.C. § 1395dd(e)(3). It does not modify the requirement that, for EMTALA's stabilization provision to apply, a hospital must have determined the existence of an emergency medical condition. 42 U.S.C. § 1395dd(b)(1).

The facts alleged in the Complaint suggest that RRMC may be liable for misdiagnosis – a claim that sounds in state law. Despite treating Mr. Pidgeon in the hospital for two days, hospital personnel did not "determine" that he had an emergency medical condition. *Id.* Consequently, and because Mr. Pidgeon was an admitted patient prior to his discharge, RRMC cannot be held liable under EMTALA for failure to stabilize.

## B.   Failure to Screen

Count II alleges a failure to screen. The facts underlying the claim occurred after Mr. Pidgeon returned to the hospital by ambulance on the afternoon of February 10, 2025. According to

15

the Complaint, he was brought to the hospital by Ambulance Service EMTs at 3:38 p.m. He was ultimately taken to a resuscitation room and died at 4:48 p.m. after an attempted intubation.

RRMC first argues that, as with the failure to stabilize claim, Count II fails because the Complaint alleges Mr. Pidgeon was admitted to the hospital. RRMC's citation to the Complaint, however, references Mr. Pidgeon's admission on February 8, 2025. (ECF No. 8 at 7 (citing Complaint paragraph 15)). Count II pertains to his return to the hospital by ambulance on February 10, 2025. *See* ECF No. 1 at 11 (Complaint paragraph 110). Although the Complaint states that Mr. Pidgeon was brought into the hospital on the afternoon of February 10 and taken to a resuscitation room, it does not state that he was re-admitted. Accordingly, and based solely on the allegations in the Complaint, the Court will not dismiss Count II on the basis of a hospital admission.

RRMC also argues that Plaintiff must show Mr. Pidgeon's treatment deviated from the hospital's standard screening procedure. "EMTALA's requirement that individuals seeking emergency care receive an 'appropriate medical screening examination' obligates hospitals to 'apply uniform screening procedures to all individuals coming to the emergency room.'" *Jones v. Beth Israel Hosp.*, No. 1:17-CV-3445-GHW, 2018 WL

16

1779344, at *7 (S.D.N.Y. Apr. 12, 2018) (quoting *Matter of Baby K,* 16 F.3d 590, 595 (4th Cir.), *cert. denied,* 513 U.S. 825 (1994)). "To prevail on a failure to screen claim, a plaintiff must identify a 'departure from standard screening procedures' the hospital otherwise applies to patients." *Grenier v. Stamford Hosp. Stamford Health Sys., Inc.,* No. 3:14-CV-0970 (VLB), 2016 WL 3951045, at *2 (D. Conn. July 20, 2016) (quoting *Fisher v. New York Health & Hosps. Corp.,* 989 F. Supp. 444, 449 (E.D.N.Y. 1998)). RRMC submits that Plaintiff has failed to identify any such standard procedures, and has failed to allege that hospital staff treated Mr. Pidgeon in a way that was different from others with the same medical condition(s).

Plaintiff asks the Court to apply common sense to the question of protocol. The argument is that the hospital's standard procedures could not have called for denial of care to a person who is delivered to the hospital by ambulance, clearly in significant pain, while EMTs are urging treatment. The Court agrees that such a protocol would not satisfy EMTALA's requirement of an "appropriate" medical screening. To the extent actual protocols were in place, those may be revealed in the course of discovery.

"EMTALA does not define 'appropriate medical screening examination' except to say that the purpose of such a screening is to identify an 'emergency medical condition.'" *Byrne v.*

17

*Cleveland Clinic*, 684 F. Supp. 2d 641, 651 (E.D. Pa. 2010). Here, no such screening occurred. When EMTs urged hospital staff to accept Mr. Pidgeon as a patient, at least some staff stood by and declined to do so. The EMTs ultimately wheeled him into the hospital, accessed monitoring equipment, confirmed his serious condition, and again alerted hospital staff. RRMC allegedly failed to address that condition in a timely manner, and Mr. Pidgeon died approximately 70 minutes later.

RRMC argues that, at most, the Complaint presents a question of delayed treatment, and that the delay in this case was insufficient to give rise to a claim under EMTALA. The Court disagrees. The Complaint alleges that when Mr. Pidgeon was returned to the hospital via ambulance, the hospital refused to screen him. Although EMTs effectively conducted the screening themselves, accessing hospital equipment in order to objectively demonstrate Mr. Pidgeon's condition, their actions do not necessarily relieve the hospital of its duty to screen. The Complaint alleges a plausible claim of failure to screen, and the motion to dismiss that claim is denied.

### III. State Law Claims

The Court retains subject matter jurisdiction over Plaintiff's state law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). In this

18

case, the remaining claims in the Complaint arise primarily out of the hospital's treatment of Mr. Pidgeon on February 10, 2025. Those claims are directly related to the EMTALA failure to screen claim alleged in Count II, and "form part of the same case or controversy." *Id.* The Court therefore retains jurisdiction over Plaintiff's state law causes of action, and the motion to dismiss those claims for lack of subject matter jurisdiction is denied.

## Conclusion

For the reasons set forth above, RRMC's motion to dismiss (ECF No. 8) is granted in part and denied in part. Count I of the Complaint is dismissed. RRMC's motion to stay (ECF No. 14) is denied as moot.  The motion for extension of time to file a discovery schedule (ECF No. 14) is granted, and the parties shall submit a stipulated discovery order within 14 days of this Opinion and Order.

DATED at Burlington, in the District of Vermont, this 4th day of June 2026.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge